(158 App. Div. 14.)

### YOUNG v. ERIE R. CO.

(Supreme Court, Appellate Division, Fourth Department. July 8, 1913.)

1. RAILROADS (§ 348*)—ACCIDENT AT CROSSING—FINDINGS—SUFFICIENCY OF EVIDENCE.

　　Evidence in an action for the death of a woman found dead at a railroad street crossing held not to sustain a finding that deceased was killed by defendant's train.

　　[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. § 348.*]

2. RAILROADS (§ 316*)—STREET CROSSING—NEGLIGENCE—SPEED OF TRAIN.

　　Where a railway street crossing was but seldom traveled, and there was no ordinance restricting the speed, it was not negligence for a rail-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

· way company to run its train across the crossing from 35 to 50 miles per hour, so long as it gave the proper signals.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1006–1008, 1011, 1012; Dec. Dig. § 316.\*]

3. RAILROADS (§ 350\*)—ACCIDENT AT CROSSING—SIGNALS—SUFFICIENCY OF EVIDENCE.

Where, in an action for the death of a woman killed at a street crossing, both the engineer and fireman testified positively that signals were given for the crossing, and were only contradicted by the negative testimony of one witness, the evidence was not sufficient to take to the jury the question of defendant's negligence in this respect.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.\*]

4. RAILROADS (§ 314\*)—STREET CROSSINGS—OBSTRUCTION.

A railroad company was not negligent in permitting four or five empty coal cars to stand upon a side track at a street crossing, where the cars were only one-half the height of the approaching train, and did not obstruct the view of a pedestrian.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 965; Dec. Dig. § 314.\*]

5. RAILROADS (§ 346\*)—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

In an action for the death of plaintiff's intestate, plaintiff cannot recover, when there is no evidence that deceased looked and listened, or exercised any care, before going upon the tracks.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1117–1123; Dec. Dig. § 346.\*]

Kruse, P. J., and Robson, J., dissenting in part.

Appeal from Trial Term, Erie County.

Action by Clara Young, administratrix, against the Erie Railroad Company. From a judgment in favor of plaintiff, defendant appeals. Reversed, and new trial granted.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Moot, Sprague, Brownell & Marcy, of Buffalo (John W. Ryan, of Buffalo, of counsel), for appellant.

Eugene L. Folk, of Buffalo (E. C. Schlenker, of Buffalo, of counsel), for respondent.

MERRELL, J. Plaintiff's intestate was found dead on the morning of November 22, 1910, a few feet from defendant's track north of Felton street in the city of North Tonawanda, N. Y. It is claimed on the part of the plaintiff that her intestate came to her death by being struck by the north-bound flyer on the defendant's road, which passed across Felton street, north-bound, shortly before 9 o'clock on the evening of November 21, 1910, and it is claimed that her death was caused by negligence on the part of the defendant company in driving its trains across said street at a high rate of speed and without giving proper signals, warning pedestrians on said street, and that the conditions were such that the plaintiff's intestate was relieved from that degree of watchfulness which otherwise would have been required of her. The physical surroundings at the point in question are as follows:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Felton street, at the point where it is claimed plaintiff's intestate was killed, runs substantially in a northeasterly and southwesterly direction. Crossing said street near the point where Mrs. Seeman's body was found were five railroad tracks. Beginning with the easterly track, the first is a switch track operated by the defendant company in switching its cars. Next westerly is the main track of defendant, where it is claimed plaintiff's intestate was killed. The distance between the westerly rail of the switch track and the easterly rail of defendant's main track was 8½ feet. West of defendant's main track, and substantially parallel thereto, runs one of the main tracks of the New York Central Railroad Company. The distance from the westerly rail of the defendant's main track to the easterly rail of the New York Central track was 56½ feet. Proceeding southwesterly along Felton street, there are two other New York Central tracks, each about 10 feet distant from the other. Southwesterly of the third New York Central track, 72 feet therefrom and running substantially parallel therewith, is a highway running along the Niagara river, known as the "River Road." At the junction of Felton street and said River Road there was concededly at the time of the accident an arc electric light burning; said light being placed in the River Road at the end of the northerly sidewalk of Felton street. Upon the switch track of the defendant at the time of the accident, from Felton street southeasterly, were four or five empty coal cars extending from said street southeasterly upon said switch track. The decedent resided on the northerly side of Felton street, from 450 to 500 feet northeasterly of defendant's tracks. Felton street, at the point in question, runs through the lumber district of North Tonawanda, and is unpaved, but has a sidewalk on each side of the street. It would appear that the street was not very frequently traveled, except during the busy hours of the day. For more than a year prior to decedent's death the defendant had maintained a sign in a conspicuous place at said crossing to the effect that a flagman was not stationed at the crossing to warn pedestrians during the hours from 7 o'clock in the evening to 7 o'clock the following morning. There was no eyewitness of the accident, which it is claimed occurred to plaintiff's intestate as before stated.

[1] The evidence shows that, shortly before 8 o'clock on the evening before her remains were found, Mrs. Seeman left her home, and it fairly appeared from the evidence that at that time she was somewhat under the influence of intoxicating liquors. She first crossed the street, and remained at the boiler house of a planing mill near by and at the residence of a nearby neighbor for half or three-quarters of an hour. A few minutes later, one George Wiederman, a son of the owner of the planing mill, who testified that he was standing near the south sidewalk on Felton street, at a distance of 550 to 600 feet northeasterly of defendant's tracks, claims to have seen Mrs. Seeman leave her own house on the northerly side of the street and to proceed in a southwesterly direction towards the defendant's tracks. Wiederman testified that it was a pretty nice, fair night, and was light enough so that he could see plaintiff's intestate proceeding along the northerly

side of the street toward the defendant's tracks. It is entirely upon the testimony of the witness Wiederman that the plaintiff seeks to recover against the defendant, and insists that the verdict of the jury should not be disturbed. He testified that he continued to watch decedent as she approached the defendant's tracks, and that he was able correctly to estimate when he last saw her she was at a point 20 feet northeasterly from defendant's main track. He says that he watched her until she was obscured by the shadow cast by the flyer passing northwesterly along defendant's main track as it crossed Felton street, thus obscuring the rays of the arc light at the junction of Felton street and the River Road before referred to. The witness seems positive as to the distance which Mrs. Seeman was from the main track at the time when his vision of her was cut off by the shadow of defendant's locomotive and train. He testified:

"As soon as she got to that spot, about 20 foot from the crossing, she was 20 foot, and as I looked up she started to walk, and the train approached, and it stopped the view of the light as the end of the street. The train approaching across the street stopped the view; so that, when Mrs. Seeman was about 20 feet east of the main track, the engine went across the street and obstructed the view of the light from this light in the River Road."

And still further:

"I followed Mrs. Seeman with my eye until she was cast in the shadow of the train. * * * The train came here. * * * And as she was walking along, this train came along, and threw the reflection of this light, and I saw her no more."

The plaintiff also offers as a witness one Klinch, employed on the night of the accident as watchman in the lumber yard of White, Gratwick & Mitchell in the vicinity of this crossing. Klinch testifies as follows:

"That evening I saw her a little bit before 9 o'clock; five minutes before 9, or such a matter. * * * When I saw her, I was just going to go down to pull the clock, just before 9 a little while. I saw her there at the end of Felton street; that is, at the point where Felton street runs into the River Road, right at the foot of Felton street; that was west of everything. At the time I saw her there, she was going across; she was just going down there, and I met her there; she was on the west side of Felton street— of the River Road; she was on the River Road on the opposite side of the lumber yard. There is no sidewalk where the lumber yard is. At the time I saw her she was just going along, and I bade her 'Good evening' and went right along. She was west of Felton street at the time."

These witnesses, Wiederman and Klinch, are the only persons claiming to have seen plaintiff's intestate at about the time she is claimed to have been struck. Wiederman further testified that he heard no whistle blown nor bell rung by defendant's train as it crossed Felton street on the occasion in question. He testified that it was a quiet night, and that he could hear the whistle of the train, although he was not listening for it; that there was no reason why he should listen. He does state, however, that he took his attention off of Mrs. Seeman before he actually saw the train, but afterwards testified that he watched her until she got to the dark spot cast by the locomotive of defendant's train shutting off the rays of the arc lamp at the foot of Felton street. Wiederman also testified that the train, which was

known as the "Nine O'clock Flyer," was traveling at the rate of from 35 to 50 miles an hour as it crossed Felton street, and neither the engineer nor fireman contradicts his testimony in this regard.

It seems to me that the testimony offered in support of plaintiff's contention that the plaintiff's intestate came to her death at the time mentioned by being struck by defendant's train falls far short of establishing a prima facie case of defendant's negligence. If the testimony of Wiederman is to be given any credence whatever, it would be a physical impossibility for Mrs. Seeman to have been struck by said train. From the point where Wiederman stood, and where he is positive he followed with his eye the plaintiff's intestate as she approached the track to a point 20 feet northeasterly thereof, where she was lost to view by the train casting a shadow from the arc light, it would be impossible for her to have covered the 20 feet between the point where he last saw her and the defendant's track in time to have gotten upon the track ahead of defendant's train. At the rate stated, 35 to 50 miles an hour, it would have required only a small fraction of a second for the locomotive to have traversed the short distance where it must have been at the time its shadow obscured Mrs. Seeman to the place where it crossed the sidewalk upon which she was walking. Felton street is 50 feet in width at that place, and, assuming that the train was traveling as slow as 30 miles an hour, it would have required only about one second to have crossed the street from its southerly to its northerly side. It therefore seems to me a physical impossibility for plaintiff's intestate to have gotten in front of defendant's locomotive, if the testimony of plaintiff's sole witness, who claims to have seen her immediately before the accident, is to be believed. Then the testimony of Klinch, who testifies that he saw plaintiff's intestate about five minutes before 9 on River Road westerly of all of the tracks in that vicinity, would seem to negative the possibility that she came to her death in the manner claimed.

[2] But, assuming that plaintiff's intestate was struck by the defendant's 9 o'clock train crossing Felton street, I think the testimony fails to show that the defendant operated said train without due care or was in any manner negligent. As before stated, Felton street, at 9 o'clock at night, was but little traveled. The record does not show that any order was ever made compelling the defendant company to maintain gates or flagmen at said crossing. It does, however, appear that for more than a year prior to the death of Mrs. Seeman the defendant company had maintained a flagman at said crossing to warn the public of approaching trains, but that said flagman's hours were confined to the day, and that from 7 o'clock at night until 7 o'clock the next morning no flagman had been stationed at the crossing. Plaintiff's intestate was entirely familiar with that condition. She lived but a few hundred feet from the crossing, and was in the habit of crossing defendant's track several times each week. Nor does it appear that there was any restriction by way of ordinance of the municipality as to the rate of speed of defendant's trains. It was not negligence, therefore, on defendant's part to operate its train at a speed of from 35 to 50 miles an hour, so long as it gave proper signals

of its approach to said crossing. Phelps v. Erie Railroad Company, 134 App. Div. 729, 119 N. Y. Supp. 141.

[3] Plaintiff seeks to show that defendant was negligent in operating its said train by omitting to blow a whistle or ring a bell or give other signal at said crossing. The only witness who testifies on that subject in behalf of plaintiff is the man Wiederman, who claims to have watched plaintiff's intestate until she was lost in the shadow of the passing train. It must be remembered that Wiederman was about 600 feet east of the track. He merely testifies that as the train came along he heard no sounds or signals, or any bell rung or whistle blown. He states that he was not exactly listening for trains, but that it was a quiet night, and he could have heard the whistle, if blown; that there was no reason why he should listen. He further testifies that his attention was drawn to the approaching train before he actually saw it. How, then, was his attention so directed, except by the sounding of some signal warning? If it was alone the sound made by the approaching train that drew his attention 600 feet away from the crossing, how much plainer must have been that noise to plaintiff's intestate, who was within 20 feet of defendant's track and within less than 100 feet of the approaching train. It is not at all strange that Wiederman did not recall having heard the whistle blown or bell rung. With the numerous tracks and frequent passing of trains across said street, it would be strange if the ringing of a bell or the blowing of a whistle would make an impression upon his mind.

As against the negative evidence of Wiederman, we have the positive testimony of the engineer and fireman upon the passenger train that the whistle was blown at said crossing, and that the engine bell, an automatic contrivance, was ringing constantly from the time the train left Buffalo until it reached its destination at Niagara Falls, on the Ontario side. It seems to me that something more is required to discredit the positive testimony of the engineer and fireman on the giving of the signals than the mere negative evidence of Wiederman that he did not hear them. I do not think that the testimony of Wiederman that he heard no signals, contradicted by the positive affirmative evidence of the engineer and fireman, was sufficient to authorize the submission of the question of defendant's negligence to the jury by reason of failure to sound proper signals. Culhane v. N. Y. C. & H. R. R. Co., 60 N. Y. 133; Foley v. N. Y. C. & H. R. R. Co., 197 N. Y. 430, 90 N. E. 1116, 18 Ann. Cas. 631.

[4] But plaintiff also contends that defendant was negligent in permitting the coal cars, four or five in number, to stand upon its switch track parallel with its main track and 8½ feet northeasterly therefrom. It is claimed on the part of the plaintiff that such coal cars obstructed the vision of Mrs. Seeman as she approached the crossing, and that the defendant was guilty of negligence in permitting said cars to stand upon said siding. I do not think that such claim has any merit whatever. The evidence shows that the cars in question were the ordinary coal cars, and were only about half the height of the locomotive and passenger cars on defendant's north-bound train. All of said coal cars stood on the southerly side of Felton street, and plaintiff's

intestate was approaching the crossing on the northerly side of said street in a most favorable position to observe a train approaching from the south on the main track.

Wiederman testifies that, earlier in the same evening he saw plaintiff's intestate approach the crossing, he himself crossed and made certain observations. He said that in passing in a westerly direction, as he came over to the side track and had reached the main track, he looked in both directions to see if a train was coming. To the north, he testifies, the track was straight for about 1,000 feet, perhaps a quarter of a mile, and that to the south he could see about a mile toward Tonawanda station. At the time Wiederman made said observations, he was walking on the southerly side of Felton street, a much less favorable position to observe defendant's main track than that occupied by Mrs. Seeman as she approached said track. Wiederman testifies that even on the south side, and when he was at a point 7 feet east of the main track, he could have seen a north-bound train approaching along the main track for more than a mile before it reached Felton street. Wiederman testifies that the defendant's train as it passed the crossing was brilliantly lighted, and the testimony of the engineer and fireman to the effect that the headlight on the engine was burning is not contradicted. I do not think that the placing of the coal cars upon the side track south of Felton street was a negligent act on the part of the defendant.

[5] But, assuming that the plaintiff's intestate met her death by being struck by defendant's north-bound 9 o'clock train, as plaintiff contends, and assuming that the defendant was in some manner guilty of negligence, I think the testimony in the case fails to show that plaintiff's intestate, at the time she was struck, was observing that care which the law required of her in crossing said track. I find no evidence whatever in the case showing her freedom from contributory negligence. As she approached this crossing she was required to look and listen. There is absolutely no evidence in the case that she did either. The locomotive headlight was burning, and the passenger train was brilliantly lighted. For a considerable distance before she reached defendant's main track, had she looked, notwithstanding the coal cars which plaintiff insists were a condition which would have made an attempt to look on her part unavailing, she could have seen the approaching train and waited for it to pass before attempting to cross the track. In fact, no circumstance appears tending to show that decedent looked or listened, or exercised any care whatever in crossing defendant's track. Wiederman does not attempt to testify that she stopped, looked, or listened. The coal cars did not cut off her vision, because they were only half as high as the locomotive headlight, which was placed upon the boiler, and the lighted passenger coaches. Under these circumstances, it would seem idle to claim that, had plaintiff's intestate looked, she would not have been able to see the approaching train. No other obstruction, except said coal cars, is mentioned. And if the witness Wiederman could hear the approaching train 600 feet away, in how much better position was decedent to hear said train when near the crossing. The record is barren of any evi-

dence showing that decedent exercised any care whatever in attempting to cross defendant's track, nor does it disclose any condition which would have rendered the use of decedent's senses of sight and hearing unavailing. Without such proof plaintiff's case must fail. Wiwirowski v. L. S. & M. S. R. Co., 124 N. Y. 420, 26 N. E. 1023; Wieland v. Delaware & Hudson Canal Co., 167 N. Y. 19, 60 N. E. 234, 82 Am. St. Rep. 707; Lamb v. Union Railway Co., 195 N. Y. 260, 88 N. E. 371.

In the Lamb Case, above cited, the decedent was run over and killed by one of defendant's trolley cars. In that case the night was dark and foggy, and the case otherwise presented much stronger circumstances in favor of the plaintiff's contention than the case at bar. The Court of Appeals in that case held that the facts did not admit of the necessary inferences to find the intestate free from contributory negligence. And the court there held that the circumstances pointed quite as much to the lack of reasonable care, or even to the possibility of suicide, as to the exercise of reasonable care and caution on the intestate's part, and nonsuit should be granted.

As before stated, Mrs. Seeman, on the night in question, was more or less under the influence of intoxicating liquors, and it is probable that she waited within its shadow for the passing of defendant's flyer; that she then proceeded easterly, and was seen by the witness Klinch on the River Road. Frequent trains were passing on the several railroad tracks in the vicinity during the night, and it is entirely probable that decedent was struck by some other train during her wanderings. Both the engineer and fireman testify to their absence of knowledge of the alleged accident, nor were there any marks or indication upon the locomotive of its having struck anything on its trip.

It seems to me that the learned trial court should have granted defendant's motion for nonsuit, made at the close of the evidence in the case, and that in rendering its verdict the jury was permitted to guess and speculate on every essential element in the case. The learned trial court erred in refusing to grant defendant's motion to set aside the verdict rendered.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event. All concur; KRUSE, P. J., and ROBSON, J., in result only, upon the last ground stated in the opinion.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event.