No. 3374½

Second Circuit

LANIER ET UX v. M. P. R. R. CO.

(January 21, 1929. Opinion and Decree.)

Philo Coco, of Marksville, and John R. Hunter, of Alexandria, attorneys for plaintiffs, appellants.

Hawthorn and Stafford, of Alexandria, and Hudson, Potts, Bernstein and Sholars, of Monroe, attorneys for defendant, appellee.

## STATEMENT OF THE CASE

REYNOLDS, J. The plaintiffs, J. R. Lanier and his wife, sought by this action to recover from the defendant, the Missouri Pacific Railroad Company, damages for the death of their daughter, Virginia, who

was killed in a collision between a fast moving passenger train owned by defendant and operated by its servants, and an automobile in which plaintiffs' daughter was riding and which was being operated by Mrs. T. L. Watson.

The collision occurred early in the afternoon on January 13, 1927, at a crossing of defendant's railroad by a public street in the town of Selma, Louisiana.

It is alleged that the collision was caused by defendant's negligence in that (1) the train was being operated at an unusual and excessive speed; (2) that the bell on the locomotive was not rung nor the locomotive whistle blown or other warning given of the approach of the train to the crossing, and (3) that the crossing was imperfectly constructed and therefore a menace to the lives of those using it in that (a) the approaches to the track, which was of considerable elevation, were so steep and sudden that the continuous motion of motor vehicles was arrested and brought to a dead stop by the necessary change of gear from high to low, which change of gear plaintiffs allege occurred in the instant case and contributed largely to the collision, and (b) that the traffic sign of the defendant failed to comply with the "Stop Law" of this State and was misarranged and in no manner conformed to the legal requirements in distance from the defendant's tracks or its relation to the highway approach thereto.

The defendant admitted the collision but denied that it was occasioned by any negligent act of commission or omission on its part, and denied the existence of the physical conditions at the crossing alleged, and alleged that if they really existed they were open and obvious to the plaintiffs' daughter and such as required that she should insist that the driver of the car in which she was riding should proceed over the approach to and defendant's tracks more carefully and stop, look and listen for the approaching train before driving upon the track, and that the deceased could and should have heard and seen the train approaching in ample time to have prevented the collision and that her failure to do so was negligence that caused or contributed to cause the collision and is a bar to plaintiffs' right to maintain the action even though the defendant was negligent.

And defendant further alleged that the collision and consequent death of plaintiffs' daughter was not due to any neglect of itself, but was caused wholly by the fault and carelessness of the driver of the car in which the deceased was riding and of the deceased herself, both of whom well knew the existence of the crossing and of the passage of trains thereover frequently and of the existence of the warning signs erected in accordance with the law, and that notwithstanding these facts both the deceased and the driver of the car failed to comply with the law and neither stopped, looked nor listened for the approach of a train before driving on the crossing, and that the driver of the car and the deceased were not paying the slightest heed to the existing condition and that had they been

paying such heed they could have seen and heard the approaching train by the blowing of its whistle and ringing of its bell and the noise its motion was making in ample time to have been aware of the danger of attempting to cross the track, in consequence of which they were guilty of such negligence as bars recovery by plaintiffs in this action.

On these issues the case was tried and there was judgment in favor of the defendant. and against the plaintiffs rejecting their demands and dismissing their suit and plaintiffs have appealed.

## OPINION

Of the many issues presented by. the record it is only necessary for us to determine whether defendant was negligent and if so whether its negligence was the proximate cause of the collision.

Plaintiffs' action is bottomed upon Article 2315 of the Civil Code and to maintain it they must prove negligence on the part of defendant and that its negligence was the proximate cause of the death of their daughter.

They contend that the train was being operated at an unusual and excessive speed, but the evidence shows that its speed was less than usual and had been reduced after the train had passed the crossing next preceding the one at which the collision occurred.

Besides this, no state law or city ordinance was shown to exist fixing a speed limit for trains less than that at which the train in question was moving.

A high rate of speed has always been a great desideratum, and engineering skill has always been taxed to the utmost to attain it; and we conceive the reasonable and established rule to be that no conceivable rate of speed consistent with the safety of passengers is per se negligence.

What mattered it at what rate of speed the train was moving if the automobile was driven upon the track so close ahead of the locomotive that it was impossible to stop the train before striking the automobile?

The engineer in charge of the locomotive testified that he became aware of the danger of a collision with the automobile by his fireman emitting a shrill scream, and that knowing from this that something was wrong he instantly applied the emergency brakes but could not stop before the collision.

The fireman testified that as the train approached the crossing in question his attention was attracted to the automobile by the fact that it was approaching the track; that it turned in at a slow speed and he was expecting it to stop for the train to pass; that it did not stop, but shot forward toward the track at an increasing speed to get over the tracks before the locomotive reached the crossing and that when he became aware that it was not going to stop he gave a scream of alarm to the engineer.

Both the engineer and the fireman testified that the brakes were in good working order.

In our opinion the proximate cause of the collision was not the speed of the train but the driving of the automobile upon the track when the locomotive was so close to the crossing that the train could not be stopped before striking the automobile.

The contention that the crossing was defective, or, if it was that defendant was responsible for it, or that the stop, look and listen sign was not properly stationed, is not stressed and we infer that it is abandoned.

This leaves for our consideration only the allegation that proper warning signals of the approach of the train to the crossing were not given. Plaintiffs assert that the bell on the locomotive was not rung nor the whistle blown as the train approached the crossing and they cite the testimony of ten witnesses as proof.

Mrs. Taylor Jones and Mrs. Charles Montgomery were driving in closed cars on the public highway parallel to the defendants' railroad as the train approached the crossing and did not hear the whistle or bell; but neither was paying particular attention to the train.

A. L. Mayson, whose testimony was most favorable to plaintiffs, said:

"Q. About how far from a point opposite this crossing where you when you first saw this train?

"A. Well, I was about even with the crossing when I first saw the train.

"Q. About how far was the train from the crossing when you first saw it?

"A. I saw it when it come around the curve, about a half mile from where I was, and you could see it from there.

"Q. About how far is the curve from the crossing?

"A. Close to half a mile, I judge.

"Q. You mean by a curve, a curve in the railroad track?

"A. Yes, sir. Might not be quite half a mile, but it don't lack much.

"Q. What attracted your attention to the train at that point?

"A. I heard him blow the whistle at the crossing at Mr. Rambo's.

"Q. About how far is that from the curve?

·"A. Well, that is just a little above the curve in the track; the track is practically straight on the other side from there and is open and you can see.

"Q. About how far is Rambo Crossing from the crossing where the accident occurred?

"A. I rather think it is about half a mile.

"Q. Did you observe the train from the time you saw it or heard it blow for the Rambo Crossing utnil it reached the crossing where the accident occurred?

"A. Well, I wasn't particularly watching, but I remarked that 'it was leading them to Alexandria'—a slang expression.

"Q. From the time that that train blew for what you call Rambo Crossing to the time it reached the crossing where the accident occurred, did it blow again?

"A. No, sir; it did not.

"Q. If it had blown, could you have heard it?

"A. Yes, sir.

"Q. From the time the train blew for the Rambo Crossing up to the time that it reached the crossing where the accident occurred, did the train ring the bell?

"A. I never heard it.

"Q. If the bell had rung would you have heard it?

"A. Yes, sir."

His testimony is considerably weakened by that of another of plaintiffs' witnesses, Floyd Fullerton, who testified:

"Q. Did Mr. Mayson come to your house about the time of that accident?

"A. We were together.

*       *       *       *       *       *

"Q. Where did you get with A. L. Mayson?

"A. Somewhere near the commissary.

"Q. You and he walked over home together?

"A. We did.

"Q. Walking along talking?

"A. Well, as usual.

"Q. Was Mr. Mayson walking any faster than you were?

"A. No; by my side.

"Q. Where were you when you heard the crash?

"A. I was between my back porch and my car barn; some sixty or seventy feet to my car barn: I was between there and my car barn; I don't know exactly.

"Q. When you were walking along there with Mr. Mayson, did you see this train coming?

"A. Well, I don't recall it if I did.

"Q. Did you hear any whistle or warning signals given?

"A. I don't recall that if I did.

"Q. Was that because you didn't pay any attention?

"A. No; because I am accustomed to trains passing back and forth in front of my house day and night."

Fullerton's testimony puts Mayson elsewhere than Mayson puts himself.

The testimony of W. E. Jackson, another of plaintiff's witnesses, is also at variance with that of Mayson.

He testified:

"Q. Mr. Jackson, did you witness all or any part of an accident that occurred about noon January 13, 1927, at Selma? I refer to the accident where Mrs. Watson and Virginia Lanier were killed.

"A. I did.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Now, what caused you to observe the approaching train?

"A. Heard the whistle.

"Q. Where was this train when you heard the whistle?

"A. The engine was in the curve.

"Q. About how far is that curve from the crossing where the accident occurred?

"A. Between fifteen and twenty telephone poles.

"Q. Could you express that in terms of yards and feet?

"A. No; I don't know the distance between those poles.

"Q. Did you have an unobstructed view of the railroad and train?

"A. I did.

"Q. Now, when did you first notice the car that Mrs. Watson was driving—where was it when you first saw it?

"A. There about even with the little store and I was practically on the model road.

"Q. Well, you had an unobstructed view of the car as well as the train?

"A. I could see them both plain.

"Q. Now, did you see the car as it approached the crossing?

"A. I did.

"Q. Was there any change in the speed of the car from the time you first saw it until it approached the crossing?

"A. It was.

"Q. What was the change?

"A. Slowing down and going into the curve.

"Q. What kind of a curve was that that the car was going into, Mr. Jackson?

"A. Well, as it being on her side—the way the car was travelling—it is a short curve.

"Q. About how far is that curve from the Missouri Pacific?

"A. Judging, thirty-five.

"Q. Thirty-five feet you mean?

"A. Yes, sir.

"Q. Now, did the car, after it had decreased its speed, as you testified, increase it before going on the crossing?

"A. As it started up the incline.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. From the time you heard the train blow in the curve, until the automobile started on the crossing, did you hear the train blow any more?

"A. I did.

"Q. Where was the train then?

"A. The train was out of the curve.

"Q. About how far from the crossing?

"A. I am judging a quarter of a mile.

"Q. Now, was that the last time you heard the train blow?

"A. Yes, sir.

"Q. Now, as the train approached the crossing, and after giving this blast that was a quarter of a mile away, did you hear the train ring a bell?

"A. I didn't pay any attention.

"Q. You couldn't tell whether it rang a bell or not?

"A. I couldn't say."

C. C. Parker, another witness for plaintiffs, is also at variance in his testimony with that of Mayson.

He testified:

"Q. Did you drive down the road behind Mrs. Watson as she came south towards the crossing?

"A. I did.

"Q. About how far behind?

"A. I don't know how far; must be about thirty or thirty-five feet.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. As you were driving down the highway, did you become aware of the presence of an approaching train?

"A. Not until it passed.

"Q. About where were you north of this crossing when the train passed?

"A. About eight or ten lengths, rail lengths, north. The rail lengths were thirty-three feet.

"Q. What attracted your attention to the train, Mr. Parker?

"A. The engine passed and blew two short whistles."

Roy Wise, another of plaintiffs' witnesses, testified:

"Q. Did you see or hear anything of the accident?

"A. I heard the accident.

\* \* \* \* \* \*

"Q. Had you seen the train from the time you left the schoolhouse and got home?

"A. No, sir.

"Q. But you heard the impact?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. From the time you left the school building till the impact, did you hear the train give any signals—ringing of bell or blowing of whistle?

"A. No, sir.

"Q. Did you hear the rumbling of the train?

"A. I was talking to my mother and didn't notice the rumbling of the train and didn't pay no attention to it. It might have blown."

Page Mahaffey, another of plaintiffs' witnesses, testified:

"Q. Well, where were you when you did see or hear this train?

"A. I was at the first house.

\* \* \* \* \* \*

"Q. What attracted your attention to the train?

"A. The whistle.

"Q. How many blasts did you hear?

"A. One.

"Q. What kind of whistle was it, long or short?

"A. Long.

"Q. When you heard this blast, did you turn to look at the train, and see it?

"A. Yes, sir.

"Q. Where was the train at the time or just after you heard that blast?

"A. Right in the curve."

James Fullerton, another of plaintiffs' witnesses, testified:

"Q. Now where was the train when you first got notice of the train?

"A. It was in the curve, up—

"Q. About how far is that curve, James, from the point of the accident, at the crossing?

"A. I guess about half a mile.

"Q. Now, what caused you to notice the approach of the train?

"A. Heard the whistle.

"Q. What kind of blast did you hear, one whistle or two?

"A. I don't remember; I just heard it blow.

"Q. When you heard the blast of the whistle, did you turn and look at the train?

"A. I did.

\* \* \* \* \* \*

"Q. Now, from the time that you heard the train blow up at the curve, up until the time the train passed you, did you hear the train blow again?

"A. I did not.

"Q. When the train passed you, was it ringing the bell?

"A. I don't know.

"Q. If it had been, could you have heard it?

"A. I could have if I had been paying any attention to it."

Mrs. S. R. Rambo, another witness of plaintiffs, testified:

"Q. Did you hear the train or any signals that the train was giving before you saw it?

"A. I didn't hear any.

"Q. How did you happen to observe the approach of the train?

"A. I reached down to pull the brake of the car up, and as I raised up I happened to notice the train.

"Q. Now where was the train when you saw it?

"A. Right in the curve at the schoolhouse.

\* \* \* \* \* \*

"Q. Now, from that time, did you ob-

serve the train until it got as far north as the north crossing in Selma?

"A. I didn't notice it after it passed. I was looking the other way, and didn't notice the train any more."

The testimony of these witnesses indicates that they were too engrossed in their own affairs and were too little interested in the approaching train to notice that the whistle was blown and the bell was ringing for the crossing where the accident occurred. Having heard the whistle blow when the train was in the curve they were no longer interested in it.

As against the negative testimony of these witnesses we have the testimony of the engineer and fireman on the locomotive who swore positively that the whistle was blown for the crossing where the accident occurred and the bell was ringing when the crossing was reached. The bell rings automatically and was still ringing after the train had been stopped.

And the testimony of the engineer and fireman that the whistle was blown is corroborated by that of J. E. Ferguson and Mr. A. L. Toliver, both of whom were passengers on the train as employees of defendant for the purpose of ascertaining whether signals required to be given of the movement of trains were given and properly given, and both of whom testified that the whistle for the crossing was blown.

L. W. Kennedy, conductor; A. R. Setzler, brakeman, and George Frazier, porter on the train, were not sworn and did not testify in the case, but it was admitted by plaintiff and defendant that if they were sworn and testified their testimony would corroborate that of the engineer, Bolen, as to the operation of the train generally, its speed and the warnings sounded on approaching the crossing where the collision occurred, except as to the ringing of the bell at the time the emergency brakes were applied, and that conductor Kennedy was working his train for tickets, and was in the first Pullman; brakeman Setzler had been on the steps of the rear car and was in the rear car where the witnesses Ferguson and Toliver were, and that the porter Frazier was in the colored coach. That none of them recall hearing the bell ringing but that all knew that when the train stopped and they got off the bell was then ringing.

The evidence satisfies us that as the train approached the crossing where the collision occurred the bell of the locomotive was ringing and the whistle was blown for the crossing and that after the engineer and fireman discovered the peril of the occupants of the automobile they did everything possible to stop the train before it struck the automobile. The evidence shows that the automobile was driven upon the railroad tracks when the locomotive was too close to the crossing for the train to be stopped before reaching the crossing, and it shows also that the fireman warned the engineer of the danger as soon as the driver of the automobile turned the car to go upon the railroad track and that the engineer instantly applied the emergency brakes and that the brakes were in good order and worked, and that the collision was unavoidable.

There was no fault on the part of the persons in charge of the operation of the train, and therefore plaintiffs cannot recover.

It is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed.