**EASTERN AIR LINES, Inc.,**
Appellant,

v.

**UNION TRUST COMPANY et al.,**
Appellees.

**UNITED STATES of America,**
Appellant,

v.

**UNION TRUST COMPANY et al.,**
Appellees.

**Nos. 11991, 11992, 12017, 12018.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 22, 1954.

Decided Feb. 8, 1955.

Petition for Rehearing In Banc Denied in all Cases on April 15, 1955.

Petition for Rehearing Denied by the Division which Heard the Case in Nos. 11991–2 on May 4, 1955.

Petition for Rehearing Denied by the Division which Heard the Cases in Nos. 12017–8 on May 11, 1955.

As Amended June 24, 1955.

Wilbur K. Miller, Circuit Judge, dissented as to applicability of law of Virginia.

Mr. Joseph W. Henderson, Philadelphia, Pa., with whom Mr. Richard W. Galiher, Washington, D. C., and Mr. John M. Aherne, of the bar of the Supreme Court of New York, were on the brief, for appellant in Nos. 11,991 and 11,992.

Mr. Lester S. Jayson, Atty., Dept. of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Messrs. Leo A. Rover, U. S. Atty., Paul A. Sweeney, Atty., Dept. of Justice and D. G. Galotta, Atty., Civil Aeronautics Administration, were on the brief, for appellants in Nos. 12,017 and 12,018. Mr. Lewis A. Carroll, Asst. U. S. Atty., entered an appearance for appellants in Nos. 12,017 and 12,018.

Mr. David G. Bress, with whom Messrs. Sheldon E. Bernstein, Alvin L. Newmyer and Jo V. Morgan, Jr., Washington, D. C., were on the brief, for appellees in all cases.

Before EDGERTON, WILBUR K. MILLER and FAHY, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On the morning of November 1, 1949, an Eastern Air Lines DC-4 plane was flying from New York to Washington, carrying fifty-one passengers and a crew of four. When it was on final approach for landing on runway 3 at the Washington National Airport and at an altitude of about 300 feet, the airliner was struck from above and behind by a P-38 military-type aircraft just purchased by the Bolivian Government, which was being tested by a Bolivian military pilot, Eric Bridoux, who was its only occupant. The DC-4 was cut in two. The forward part fell in the Potomac River, the after portion on the Virginia shore. All fifty-five persons aboard were killed. The P-38, badly damaged, of course, plunged into the river but somehow Bridoux escaped from the cockpit. He was rescued and, despite serious injuries, survived.

These suits were brought in the United States District Court for the District of Columbia by the Union Trust Company and Melville W. Stuart as the executors of Ralph F. Miller and Mildred E. Miller, his wife, who were passengers on the DC-4. Eastern Air Lines, Inc., and Eric Bridoux were named as defendants in two of the actions and the United States was the defendant in the other two.[1] Many similar suits filed on behalf of the estates of others who died in the fatal crash are pending under an agreement that the determination of liability in these cases shall govern their disposition.[2]

Although the two captioned cases against Bridoux and Eastern were tried to a jury, and the two against the Government to the court, by agreement of the parties all four actions were tried simultaneously. The jury found Bridoux not "liable," but found against Eastern Air Lines in the sum of $50,000 for the estate of Ralph F. Miller and in the sum of $15,000 for the estate of his wife. In the Federal Tort Claims actions against the United States, the trial judge held the Government liable to the estates and fixed the damages at $50,000 and $15,-

1. Aubin & Lyons, t/a Universal Marine and Supply Company, were also named as defendants on the theory they owned or had some interest in the P-38. They were dismissed when it appeared that title to the plane had passed to the Bolivian Government.

2. It was also agreed that the determination of the situs of the accident (whether it occurred over the Potomac River, which is in the District of Columbia, or over land in Virginia), made in these cases, shall be binding in all the others. The situs is important because a Virginia statute limits recovery for wrongful death to $15,000. In the District of Columbia there is no statutory limit.

000 respectively. D.C. 113 F.Supp. 80. Eastern Air Lines and the United States appeal.

## I

We first summarize the factual background which is essential to an understanding of the reasons for reversal advanced by the appellants. The Washington National is a controlled airport; that is to say, from a glass-enclosed observation platform in a control tower standing above and west of runway 3, employees of the Civil Aeronautics Administration observe arriving and departing planes and direct their movements by radio. An incoming plane may not land and a departing plane may not take off until it receives tower permission to do so.

The Administrator of Civil Aeronautics adopted, and published in the Federal Register October 14, 1949 [14 Fed. Reg. 6247–6250], a regulation for the administration of the Washington National, which is a civilian airport owned by the United States. Section 570.55(c) of the regulation is as follows:

"(c) Aircraft landing or taking off shall conform to the air traffic pattern as published jointly in the Airman's Guide by the Anacostia Naval Air Station, Bolling Field and the Washington National Airport."

The air traffic pattern referred to is a map of the airport and vicinity, with lines drawn over it intended to show the general flight patterns for taking off from and landing on the various runways. For landing on runway 3, it shows a southward pattern to a point south of Alexandria (the downwind leg), then an east turn until over the Potomac River (the base leg), then northwardly over the river to a point a short distance northeast of Alexandria, where it curves to the left over the Potomac Yards, and then a curve to the right in a line for a straight approach to runway 3. The drawing itself was published in the Airman's Guide March 1, 1949, but was not published in the Federal Register until August 7, 1952, long after the accident here involved. The regulation published October 14, 1949, referred to but did not include the traffic pattern.

Over Eastern Air Lines' vehement objection, the trial court admitted the traffic pattern when it was offered in evidence by the appellees, and charged the jury that it was a binding Federal regulation, and that an unauthorized deviation therefrom would be negligence *per se*. Eastern admittedly had knowledge of the pattern.

On the morning of the accident Glenn D. Tigner, one of the seven traffic control operators who were working in the tower, was advised by the Eastern DC–4 at about 11:38 a. m. that it was over Beltsville, Maryland, 15 miles northeast of the airport, and was asked for landing instructions. Tigner authorized it to enter a left traffic pattern for landing on runway 3 and advised the pilot to contact the tower again from a point closer to the airport. Tigner testified that in a second communication, when the Eastern plane was still north of the airport, he cleared it to land on runway 3.[3] He fixed the time of the clearance as approximately 11:44 a. m. The DC–4 continued its flight and entered the traffic pattern as it had been directed to do. It had circled from the pattern and was

3. The Administrator of Civil Aeronautics was called by the court as a witness on the meaning of the phrase "cleared to land." He testified that when a plane in the traffic pattern of an airport is "cleared to land," the pilot of the plane is thereby authorized to commence his landing approach operation immediately; in other words, when a pilot receives that clearance, wherever he may be in the traffic pattern, there is no plane ahead of him and he may make his turn at his discretion and consistently with the safe management of his plane, and may come in and land at once on the runway which has been designated by the tower. That this is the only meaning of the phrase "cleared to land" was the unanimous testimony of all the certified air traffic controllers who testified on the subject. The trial judge instructed the jury as a matter of law that such was the meaning of the phrase "cleared to land."

on final approach for runway 3 when it was struck by the Bolivian plane.

The Bolivian P–38 had taken off from runway 3 at 11:37 a. m. and therefore had been in the air only between nine and ten minutes when the collision occurred. Shortly after he had cleared the DC–4 to land, Tigner observed the P–38 at a high altitude, circling Alexandria about seven miles south of the airport, heading toward the east and starting a turn to its left. Tigner was then talking to another plane. He was informed by a tower colleague the P–38 was requesting landing instructions. He saw it continuing its left turn and said by radio, "Bolivian 927, did you request landing instructions?" Bridoux replied he had done so, whereupon Tigner told him he was cleared to enter the left traffic pattern for runway 3 and asked him to report on his downwind leg west of the airport.

Tigner said when he next saw the P–38 it was about five miles southwest of the airport at about 4,000 feet heading northeastwardly with its gear down and in a steep and rapid descent. At 11:45 a. m. he warned the DC–4 that the P–38 was in traffic. He said to the P–38, "Bolivian 927, make a 360 to your left. You are No. 2 to land. Traffic is an Eastern DC–4, turning final ahead and below you." Bridoux did not acknowledge the message and did not turn as directed. Tigner then called, "Bolivian 927, turn left, turn left. You are No. 2 to land, following an Eastern DC–4 turning final ahead and below you." Bridoux did not acknowledge or comply.

During these transmissions the DC–4 was on its base leg turning into final approach. When Tigner saw the P–38 was not complying with his instructions, he called the DC–4 and said, "Eastern 537, make an immediate left turn. Traffic is P–38 above and behind you." The DC–4, which had gone only about a quarter of a mile on final approach, responded with a surge of power into a left turn. As it did so, the Bolivian plane struck it.

Bridoux testified that a minute after his take-off he began to have engine trouble. He reported that fact to the tower and requested landing instructions. Receiving no answer, he repeated his request and the tower said, "Land 2 on Runway 3," which he understood to mean there was another plane ahead of him behind which he was to land. He testified he also understood this message to constitute a clearance to land rather than merely clearance to enter the traffic pattern.

When he was about two miles west of the airport descending at a rate of 500 to 600 feet a minute, Bridoux said he saw a plane making a final approach for a landing either on runway 36 or 3, which was either a Beechcraft C–45 or a Lockheed C–60. He said, " * * * I realized that that was the reason I was No. 2 to land." He continued flying south until he was about five or six miles south of the field and then made a 90-degree left turn. As he did so, he observed the Lockheed or Beechcraft on the ground taxiing toward the buildings. He had not seen it actually land.

Having been told by the tower he was No. 2 to land on runway 3 and having seen, as he thought, that the plane which was No. 1 to land on that runway had already done so and had taxied away, Bridoux concluded it was unnecessary for him to check with the tower to learn whether the plane ahead of him had landed. We reproduce in the margin [4]

4. "Q. As a matter of fact, at that point you not only accepted that clearance which you told us was given, but you made another complete 360-degree turn around the airport; and then after you had done that, you started downwind leg five or six miles. A. Because I was No. 2 to land, sir.

"Q. You at no time, Captain, asked the identity of the plane that was ahead of you, did you, Captain? A. No, sir.

"Q. And you had no way of knowing, based upon information from the tower, that that plane was ahead of you, did you, Captain? A. Unless I see.

his testimony that he regarded the tower's statement, "You are No. 2 to land on runway 3," as absolute clearance to land after he had decided for himself, without further communication with or from the tower, that the No. 1 plane was out of the way.

After seeing the Lockheed or Beechcraft taxiing from runway 3, Bridoux flew on for about one and one-quarter miles and made another 90-degree left turn to proceed on final approach, after which he headed north flying at 150 m. p. h. and at an altitude of about 1,200 feet. He said he then called the tower, advising he was on final approach and that the tower responded, saying, "Bolivian P-38, prepare to land on runway 3," and gave him the wind direction; and that he acknowledged the instruction. He then put his flaps down, reduced his speed to about 130 m. p. h., and began an S turn to line up with runway 3. As he did so he heard over the radio, "Clear to the left, clear to the left," but thought the instruction was for somebody on the ground. He did not turn to the left or take any other action, but continued on his course and the collision occurred two or three seconds later.

The visibility from the P-38 was structurally limited so that Bridoux could not see ahead of him except at a considerable distance. He was flying entirely by time, computing the distance covered by multiplying his speed per minute by the number of minutes traveled. He said that at an altitude of 1,200 feet and four and a half miles from the airport he could see nothing ahead and below for a distance of two and one-half miles. It is also observed that Bridoux

"Q. And you didn't see it. A. I saw it on final approach, the C-45 or C-60.

"Q. What you are telling us is after getting that clearance, you assumed the plane you saw was the one they meant was ahead of you? A. Yes, sir.

"Q. But you didn't check with the tower to see if that was the plane? A. Why have I got to check, if I am seeing?

"Q. I am not asking you why. I am simply asking you if it isn't a fact that you didn't check back with the tower to see if that plane you saw was the one ahead of you. A. It isn't necessary, because I was seeing the airplane.

"Q. Would you please answer yes or no to my question? You didn't check back with the tower to see if that plane you told us you noticed on final approach was the one ahead of you, did you? A. When I was on final approach, I called the tower.

"Q. Captain, I am asking you, sir, if after you saw that plane, which you said seemed to be lined up for landing, which seemed to be on approach for landing on runway 3, did you at any time thereafter ask the tower if that was the plane that had been ahead of you? A. No, I didn't ask. It wasn't necessary to.

"Q. You did not ask the tower— A. Because it wasn't necessary. I was seeing the airplane. I was watching it.

"Q. What you mean is you saw a plane. A. Yes, sir.

"Q. You have no way of knowing whether that one was the one the tower

was referring to, or some other plane, have you, Captain? A. There was a way, because he was on final approach. If he didn't land yet, I understand he is No. 1.

"Q. Isn't it a fact that from that point on there was a lapse of four or five minutes before you came in, on your own final approach? A. More or less.

"Q. And you never contacted the tower to find out where the plane that was No. 1 was, did you? A. I called on final approach, advising them I was on final, and they could tell me anything at that time, in order to realize that.

"Q. That was after you had lined up for runway 3, wasn't it? A. No, sir.

"Q. You said you were on final approach. A. On final; but the final is not just the straight line. The final is after the turn from base leg.

"Q. Did you ask the tower for any permission before you lined up for final approach? A. No.

"Mr. Bress: He hadn't said he lined up for final approach.

"The Witness: I called to the tower, after the turn from base and I began the final approach.

"By Mr. Galiher:

"Q. And you didn't ask the tower for permission before you began the final approach, did you? A. I didn't have to ask the tower for permission, after I had been cleared for landing, sir.

"Q. You hadn't been cleared to land at that point, had you, Captain? A. I

said that as he descended the nose of his plane was not more than ten degrees under horizontal, and that he was accomplishing the descent by reducing his speed. Thus there was not enough nose declination to increase appreciably the extent of visibility immediately in front of and below the P–38. Bridoux did not see the Eastern DC–4 at any time.

## II

With the foregoing background, we turn to Eastern's contention that the court erred in admitting as evidence the approach and landing pattern offered as an exhibit by the appellees; and in instructing the jury it was a binding Federal regulation, a breach of which would constitute negligence *per se*.

had been cleared for landing, and the first call from the tower cleared me for landing.

"Q. You mean when you were told you were No. 2 to land on runway 3? A. Yes.

"Q. And that is the only clearance you have had up to this point? A. I know I was the second.

"Q. And that was issued upon the final approach? A. No; it was before the final approach.

"Q. Whether it was after or before you had begun the final approach, you had begun the final approach before you got any landing clearance from the tower. A. No, sir. The first call from the tower was when I was cleared for landing.

"Q. For what? A. They cleared me for landing.

"Q. For landing No. 2? A. Yes, sir.

"Q. Did you tell us that being cleared for landing No. 2 is a landing clearance, a final landing clearance? A. If they mention that word, it is.

"Q. You say it was a final landing clearance, the clearance that told you you were cleared to land on runway 3, behind another plane, or No. 2, as I think you used it? A. No. 2. That was all.

"Q. No. 2. You have no way of knowing whether that plane you told us you saw when you were on downwind leg was the plane you later saw on the landing strip or not, do you? A. I saw the craft, and I assumed it was the No. 1, sir.

"Q. That plane you told us you saw as you were on downwind leg, west of the tower— A. Before.

With respect to the traffic pattern, the court charged the jury as follows:

"* * * [T]his pattern in a general sense provided that an aircraft arriving from the north and desiring to land at the Washington National Airport on Runway 3 would proceed from north to west, in the general vicinity of the Pentagon, and then proceed from that direction south, on * * * its downwind leg, and continue in that southerly direction south in the direction of the George Washington Memorial Temple and south of the city of Alexandria; then turning due east on what is called the base leg, and ultimately what is called the final

"Q. Then you told us when you got down south, when you were turning on base leg, you noticed a plane that was landing or had landed—I think you used the expression— A. Yes.

"Q. —on the landing strip. A. Yes.

"Q. It was actually on the ground? A. Yes, sir.

"Q. You had no way of knowing from that distance of five or six miles away, did you, whether that was the same plane you had previously seen, or some other plane, did you? A. I don't know exactly. But I saw more or less the same airplane.

"Q. And you never tried to contact the tower to inquire whether or not the plane you had seen on final approach, as you call it, when you were on downwind leg, was the plane that was No. 1, did you? A. But how am I going to ask the tower that? Am I going to say 'Is the plane I am seeing No. 1?' How is the tower going to know what plane I am seeing? There was no reason of calling back to the tower.

"Q. It would have prevented this accident, wouldn't it, if you had called the tower and inquired as to the identity of the plane ahead of you? A. Except that I happened to observe this plane on final approach, not any other plane. Therefore I assumed this was the No. 1. This was the only one on final approach.

"Q. And that is where the trouble came in, because you assumed that was the plane that was ahead of you, isn't it, Captain? A. Probably, sir."

approach, a north or northeast heading.

" * * * This is the prescribed pattern. But you are instructed as a matter of law that there is nothing rigid about it. It must be conformed to in a general way. In other words, the pattern is not a line drawn over the ground which must be followed by the airplane in question. It is just exactly as the word itself indicates, a pattern which must be followed, but not with the rigidity and the inflexibility of a line from one point to another. Indeed, the very purpose of flight traffic patterns is to control traffic, and at an uncontrolled airport it must be followed; but at a controlled airport, such as Washington, the controller has the final say; and you are so instructed.

"However, the unauthorized stepping out of the pattern, leaving the pattern, departing from it—and note my language—the unauthorized stepping out of the pattern, leaving the pattern, departing from it, would be a violation of law, because the pattern is prescribed by rule which has the force and effect of law. And so, therefore, unauthorized action of the character I have just referred to would be negligence, as I have defined that term to you, and would be, as we lawyers say, negligence *per se*, in other words, would be negligence as a result of the very act itself and no further proof would be necessary. This is the negligence, in this aspect of the case, which the plaintiff alleges against Eastern. * * * "

In insisting the court erred in admitting the traffic pattern as an exhibit and in instructing the jury that it was a binding regulation and that an unauthorized deviation from the pattern would be negligence *per se*, Eastern relied on the fact that the traffic pattern had not been published in the Federal Register and cited Hotch v. United States, 9 Cir., 1953, 208 F.2d 244, 250, as authority that it was therefore not a binding regulation. The pattern had been officially prescribed, however, and Eastern had actual knowledge of it. In those circumstances we think the pilots of the DC–4 were required to follow the pattern and, since it is obviously a safety measure to some extent, the court correctly charged the jury that an unauthorized departure from it was negligence *per se*.

It is undisputed that the Eastern plane did leave the traffic pattern and circled into it again on final approach to the runway. Its departure from the pattern was not negligence if the tower had cleared the plane to land. Conceiving that an issue of fact had been developed as to whether the DC–4 had been cleared to land, the trial judge submitted that question to the jury and authorized it to return a verdict against Eastern if it should determine landing clearance had not been given,—that the Eastern plane had not been authorized by the tower to leave the traffic pattern as it did.

Whether this was error, as Eastern contends, depends on whether there was substantial evidence showing the DC–4 had not been cleared to land. On this charge of negligence against Eastern, as on all others, the burden of proof lay on the appellees. As substantial evidence sustaining the burden and showing the DC–4 had not been cleared to land when it deviated from the pattern, they rely upon (a) their contention that the Eastern plane was late and, in order to make up time, short-cut the pattern without authority; (b) the testimony of Captain Ator; and (c) the testimony of Lt. Shaw. We consider those points in the order named.

(a) Even if it be conceded that the Eastern plane was late, it by no means follows that its pilots attempted an unauthorized landing to make up time. The point is without substantial weight as evidence of lack of landing clearance to the DC–4.

(b) Appellees further argue that, if Eastern was given any clearance, it was to land after the P–38; and in support of the suggestion they point to the testimony of Captain M. D. Ator, the check pilot of American Flight No. 1, which at the time of the crash was at the south end of runway 3 waiting to take off. Ator said his plane was informed by the tower ground control that it could take off after an eastern DC–4 had landed. On the basis of this evidence, appellees argue as follows:

> " * * * According to Tigner, he cleared Eastern to land first and the P–38 to follow Eastern. But if Ator was to take off after Eastern landed, he would have conflicted with the P–38. Thus the Ator testimony indicates that if Eastern was cleared, it was to land after the P–38."

The argument rests on a false premise. Tigner did not testify that he cleared the P–38 to land. He testified that he told the P–38 it was "No. 2 to land on runway 3." This did not authorize it to leave the traffic pattern and descend. That it was No. 2 *to land* does not mean that Ator could not take off before it was cleared to land and after Eastern landed. In any event this testimony of Ator is insufficient to furnish a basis for a finding that if Eastern was cleared to land it was to be after the P–38.

(c) Lt. Meredith D. Shaw, co-pilot, was flying a National Airlines DC–4 en route from New York to Washington on the morning of November 1, 1949. The pilot, Captain Porter, was handling the radio. Shaw testified that when he was over Beltsville, Maryland, he heard the Eastern plane report by radio to the tower, giving its position and trip number; and heard the tower clear it to enter the left traffic pattern for runway 3. Immediately afterward, at approximately 11:42 or 11:43 a. m., he said his own plane was also cleared to enter the left traffic pattern for runway 3, but was told to check again with the tower when over Hains Point. He reached Hains Point at 11:45 or 11:46, and at that time heard another radio communication which said, "Eastern, traffic, a P–38," with a direction added which he did not remember. Shaw testified he did not at any time hear any clearance to Eastern to land, although he had earphones on continuously [5] and was on tower frequency, just as Eastern was.

To the contrary, Tigner testified positively that he cleared the DC–4 to land, after which it swung from the pattern in a wide turn to approach runway 3. He adhered to that statement despite vigorous cross-examination. Tigner further said the Eastern DC–4 followed his instructions throughout the entire flight. The first notice to Eastern that the P–38 was in the air was a few seconds before the impact when the tower said, "Eastern 537, make an immediate left turn. Traffic is P–38 above and behind you." Instantly responding to this direction, the engines of the DC–4 roared and the plane began a left turn but was struck before it could escape.

Thus the question is whether Shaw's negative testimony that he heard no landing clearance given Eastern had enough probative value, as against Tigner's affirmative statement that he gave the clearance, to form an issue of fact for the jury.

It is generally held in railroad crossing cases that negative testimony of a witness that he did not hear a warning signal from a locomotive is sufficient to form an issue of fact, in the face of affirmative evidence that the warning was sounded, provided the witness was in a position to hear, and provided his attention was not distracted. A different situation is presented, however, when the witness is shown not to have been in a position to hear or appears to have

5. He qualified this statement somewhat by saying that, from the time he was over Beltsville until his plane landed, "to the best of my recollection I never took off the headset."

been inattentive. The testimony of such a witness that he did not hear the warning signal has little or no probative force. Small v. Pennsylvania R. Co., 1935, 65 App.D.C. 112, 80 F.2d 704; Strider v. Pennsylvania R. Co., 6 Cir., 1932, 60 F.2d 237; Venchik v. Pennsylvania R. Co., 1941, 143 Pa.Super. 465, 18 A.2d 118; Lanier v. Missouri P. R. Co., 1929, 9 La.App. 586, 119 So. 710; Zotter v. Lehigh Valley R. Co., 1924, 280 Pa. 14, 124 A. 284; Jensen v. Oregon Short Line R. Co., 1922, 59 Utah 367, 204 P. 101; Rickert v. Union P. R. Co., 1916, 100 Neb. 304, 160 N.W. 86; Young v. Erie R. Co., 1913, 158 App.Div. 14, 143 N.Y.S. 176; Jordan v. Osborne, 1911, 147 Wis. 623, 133 N.W. 32; Hubbard v. Boston & A. R. Co., 1893, 159 Mass. 320, 34 N.E. 459. Under the rule just stated Shaw's negative testimony was insufficient to form an issue if he either (a) was not in a position during all the crucial nine-minute period to hear messages sent from the tower to the Eastern plane;[6] or (b) appears not to have been attentive to all tower broadcasts during that period.

██ It is an unquestioned and unquestionable fact that Shaw was not in a position to hear messages from the tower during all the critical nine-minute period. He testified that, when the radio switch button was depressed for transmission from his plane, incoming messages on that frequency could not be heard by him or Captain Porter. Consequently, whenever the latter called the tower during the nine-minute period, or depressed the switch button for that purpose, it was impossible for him or Shaw

to hear a message broadcast from the tower to Eastern.

Captain Porter did not turn his radio selector to the tower until approximately 11:42 or 11:43. It follows that Shaw's plane was on tower frequency only during the last four or five minutes of the critical nine-minute period. The evidence is not clear as to when and how often during that brief period Porter depressed the switch button to call the tower and so shut off Shaw's ability to hear a message from the tower to Eastern.

In this connection it is to be noted that Shaw could not have heard the tower clearing Eastern to enter the left traffic pattern, which he said he heard at approximately 11:42 or 11:43 while he was over Beltsville. This is so because the parties agreed and stipulated that Eastern received traffic pattern clearance at 11:38 a. m.—the exact time at which Shaw unequivocally said he was over the Baltimore relay about 15 miles northwardly from Beltsville,[7] with his radio not yet tuned to the tower. It is therefore clear that Shaw did not hear—as he said and no doubt thought he did—the tower clear Eastern to enter the traffic pattern.

What, then, did Shaw hear at approximately 11:42 or 11:43 a. m.? Tigner testified that at approximately 11:44 a. m. he cleared Eastern to land. Since both Shaw and Tigner were approximating the time, it may well have been that Shaw heard the landing clearance given at that time and inadvertently mistook it for traffic pattern clearance.[8]

---

6. The period from 11:38 a. m., when Eastern was cleared into the pattern, until 11:46–11:47 a. m., when the crash occurred.

7. He was positive of that time and said the times of all other incidents thereafter to which he testified were fixed by him through arithmetical computations based on his presence at the Baltimore relay at 11:38 a. m.

   He described the Baltimore relay as "a radio fixing where two beams meet * * * when you get a solid hum,"

which is approximately 15 miles northwardly from the Beltsville fan marker. The latter is a 75-megacycle transmitter just slightly northeast of Beltsville, Maryland. It makes a fan-shaped transmission into the air, by which planes are informed they are at Beltsville.

8. We observe that in a statement given March 4, 1950, to an investigator of the CAB in Miami, Florida, Shaw said he "heard the tower giving Eastern landing clearance." To be sure, he testified that in making the statement he had misused

As we have said, it is certain he did not hear Eastern's clearance for the pattern. It follows that Shaw's statement that he heard no landing clearance to Eastern is unconvincing.

Moreover, Shaw's general situation was not conducive to careful attention, as he was operating the controls of his plane as it came over Beltsville to Hains Point and to the airport. The pilot, Captain Porter, was therefore primarily responsible for radio communications during that time. Shaw was handling the controls of a huge airplane and knew his colleague was charged with the duty of sending and receiving radio messages. We cannot attribute to him undivided attention to tower broadcasts to other planes, although he may have had earphones on. This is not to say he could not hear the communications he said he heard; but that he was not in the favorable attitude of one whose negative testimony is for that reason held to make an issue of fact.[9]

As to whether his testimony shows he listened carefully to the messages sent to Eastern by the tower—an illustration will be indicative: After testifying that at 11:45 or 11:46 he heard the tower say, "Eastern, traffic, a P–38," Shaw said, "And at that point he gave them a direction; but the direction didn't register." (By "direction" he said he meant the position of the P–38.) The direction of the Bolivian plane given to Eastern by the tower "doesn't stick in my mind," he said, although he remembered that a direction was given. The full message was stated thus by Tigner, who sent it: "Eastern 537, make an immediate left turn. Traffic is P–38 above and behind you." (Tigner is corroborated by other tower operators and also by undisputed evidence that thereupon Eastern began an immediate left turn.) So, Shaw's possible inattention is shown by the fact he heard only part of the message, and remembered only part of what he heard.

All these considerations show the inadequacy of Shaw's negative testimony; that his claimed failure to hear Tigner clear Eastern to land was due to the depression of the switch which cut off radio reception, or due either to inattention or misinterpretation, and was not enough to raise an issue of fact for the jury as to whether the DC–4 had left the traffic pattern without tower authority to do so.

■ The negative testimony is weakened further by the fact that, because of the human instinct of self-preservation and the disposition of men to avoid personal harm, Eastern's dead pilots are presumed to have acted with diligence and due care. Atchison, T. & S. F. R. Co. v. Toops, 1930, 281 U.S. 351, 356, 50 S.Ct. 281, 74 L.Ed. 896; Looney v. Metropolitan R. Co., 1906, 200 U.S. 480, 488, 26 S.Ct. 303, 50 L.Ed. 564; Campbell v. District of Columbia, 1935, 64 App.D.C. 375, 78 F.2d 725; Baltimore & P. R. Co. v. Carrington, 1894, 3 App. D.C. 101; Bratt v. Western Air Lines, 10 Cir., 1948, 169 F.2d 214, 216; Northern Pac. R. Co. v. Spike, 8 Cir., 1903, 121 F. 44, 47. It has been said the presumption "rises to the dignity of evidence." United States v. Fotopulos, 9 Cir., 1950, 180 F.2d 631, 637.

■ As we said in Universal Airline, Inc. v. Eastern Air Lines, Inc., 1951, 88 U.S.App.D.C. 219, 188 F.2d 993, it is not for us to substitute our views for those of the trier of fact in the District Court when there is conflicting evidence. But here, as in that case, the evidence concerning the crucial fact is without substantial conflict. Affirmative testimony that the Eastern plane was cleared to land was not countered by evidence sufficient to form a factual issue; hence the appellees failed to carry their burden

---

the term "landing clearance." But whether he in fact misused the term "landing clearance" in describing the clearance he heard, is open to serious question because, as we have shown, he

could not have heard the actual traffic pattern clearance which was given earlier to Eastern.

9. Captain Porter did not testify.

of showing the contrary by a preponderance of the proof. The intervention of the jury is required only where some question of fact is actually in controversy. Oscanyan v. Arms Co., 1880, 103 U.S. 261, 266, 26 L.Ed. 539.

While there were other charges of negligence against Eastern which were submitted to the jury, certainly the principal accusation was that it attempted to land without having been cleared by the tower to do so. Since the trial court simply asked the jury, "Is Eastern Air Lines liable?" and the jury simply answered, "Yes," we do not know in what way its members considered Eastern had been negligent; but we do know the jury was authorized by the court to find against the Air Lines if it should conclude the DC–4 had not received landing clearance. We are therefore forced to hold the trial court erred in submitting to the jury the question whether the Eastern plane unauthorizedly deviated from the traffic pattern. Having so held, we think it unnecessary to discuss the other grounds for reversal advanced by Eastern Air Lines. The judgments against it will be reversed, and the cases will be remanded for a new trial.

## III

The principal question presented by the Government's appeal is whether the United States has consented to be sued for negligence of its control tower employees in regulating air traffic at a public airport. In answering the question, we must construe the Federal Tort Claims Act which limits the liability of the United States to that which a "private individual" would have "under like circumstances,"[10] and excludes claims arising from the performance of a discretionary function or duty.[11]

The Government insists that its tower operators perform governmental functions of a regulatory nature; that no private individual has such power of regulation; that therefore the Act does not permit suit based on negligent performance of their duties. The situation involved here, says the Government, when viewed in all the circumstances, "cannot be equated to one which would predicate analogous private liability," and so it is said the claims are excluded from the coverage of the Tort Claims Act.

The history of the development of the control tower is helpful in considering

10. 28 U.S.C. § 1346(b) and § 2674 are as follows:

§ 1346(b). "Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

§ 2674. "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case wherein death was caused, the law of the place where

the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof. June 25, 1948, c. 646, § 1, 62 Stat. 983."

11. The pertinent portion of 28 U.S.C. § 2680 is as follows:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

whether there is or may be private liability analogous to that sought to be imposed upon the United States in this case. What is said to be the forerunner of the present control tower was constructed in 1931 at an airport in Cleveland, Ohio. During the following five years 20 other cities erected and operated towers, and by 1939 there were 52 towers being operated by municipalities.

Regulations promulgated under the Civil Aeronautics Act of 1938 provided for the issuance of certificates of competence to tower operators; and standard procedures, equipment, installations and tower operating techniques were suggested, but were not required to be adopted. November 1, 1941, the CAA issued a *Manual of Operations* setting forth Standard Airport Traffic Control Procedures, and shortly thereafter all certificated tower operators were required to apply them.

In August, 1941, Congress appropriated funds to enable CAA to maintain and operate a number of towers. Through gradual increase in funds available, the CAA was operating 165 of the country's 200 towers on November 1, 1949, the date of the accident involved here. As late as April, 1954, there were still a number of towers in operation which had not been taken over by CAA personnel. The operators in those non-Government towers must be certificated by CAA before they may control civil aircraft in air commerce.[12] Such towers are subject to CAA inspection;[13] and the Administrator of Civil Aeronautics has prescribed procedures and techniques which must be followed by the towermen. Nevertheless, these non-CAA controllers are not government employees, and perform no governmental function.

Airports are usually constructed, maintained and operated by municipalities, probably because the cost of construction is great and the prospect of financial reward does not attract private capital. But, as far as we know, as of November 1, 1949, there was no reason why a private individual or a private corporation could not construct an airport and operate a control tower manned by its own operators certificated by the CAA. Such an individual or corporation would of course be liable for the negligence of privately employed tower operators. It follows that, when the United States entered the business of operating a civil airport and an air traffic control tower in connection therewith, it assumed a role which might be and was assumed by private interests. Hence, under 28 U.S.C. §§ 1346(b) and 2674, the Government is liable for the negligent acts or omissions of its control tower operators in the performance of their functions and duties, unless those Code provisions do not apply because the operators' activities are of the sort described in the exceptions subsection, § 2680(a).

The United States insists that the subsection applies, and shields it from liability here. It argues that § 2680(a)

"* * * incorporates into the Act the historic principle that the courts will not, in a private action, revise or review executive conduct involving the exercise of judgment or discretion of a public character";

that the tower operators' duties are public in nature and involve the exercise

---

12. 49 U.S.C.A. § 401(6) includes within its definition of an *airman* "any individual who serves in the capacity of * * * air-traffic control-tower operator." And 49 U.S.C.A. § 560(a)(2) prohibits any person from serving as an airman in any capacity without an appropriate certificate to so serve. To be eligible for a control tower operator certificate an applicant must meet physical, experience and other qualifications and must pass an ex-amination on the subject of air traffic control. 14 Code Fed.Regs. Part 26.

13. 49 U.S.C.A. § 556 is as follows:
"The Administrator of Civil Aeronautics is empowered to inspect, classify, and rate any air navigation facility available for the use of civil aircraft of the United States, as to its suitability for such use. The Administrator of Civil Aeronautics is empowered to issue a certificate for any such air navigation facility."

of discretion and judgment, with the result that neither the operators nor the United States can be held liable for their negligent performance.

The principle referred to is indeed historic, as it was stated in Marbury v. Madison, 1803, 1 Cranch 137, 169–170, 5 U.S. 137, 169–170, 2 L.Ed. 60, and has since been consistently adhered to. We have no doubt that the principle was consciously restated by Congress when it declared in § 2680(a) that the United States should not be liable on

> "Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

The heart of the question, however, is whether this case falls within the historic principle; whether the Government is correct in saying, as the second step in its argument, "that the tower operators' duties are public in nature and involve the exercise of discretion and judgment." We think the statement is incorrect, for the reasons hereinafter given. We hold that the tower operators merely handle operational details which are outside the area of the discretionary functions and duties referred to in § 2680(a); and that, consequently, the Tort Claims Act permits the Government to be sued for damages sustained because of their negligence.

Applicable authority is available to sustain our view, as comparable questions have been considered by other courts. Costley v. United States, 5 Cir., 1950, 181 F.2d 723, involved the question whether the Tort Claims Act permitted the Government to be sued for the negligence of its employees in an army hospital. A master sergeant's wife was admitted to the maternity section. As an incident to delivering her child, employees of the United States prepared and injected into her body a drug which was intended to be a spinal anaesthetic but in fact was a very harmful substance which caused the woman to be permanently paralyzed from the waist down.

The question on appeal from the District Court's dismissal was whether the employees were under a duty to use due skill and reasonable care in attending Mrs. Costley after having admitted her to the hospital under an army regulation authorizing her admission, or whether they were performing a discretionary duty or function which, under § 2680 (a), cannot be made the basis of a tort claim against the Government. The Court of Appeals quoted the army regulation that wives of soldiers may be admitted to army hospitals when suitable facilities for hospitalization are available, and then said, 181 F.2d at page 725:

> "With facilities available for her care, Mrs. Costley was admitted to the hospital pursuant to the above regulation. Having decided that there were facilities available, and having admitted her for treatment, the hospital authorities no longer had any discretion to exercise with regard to whether she was to receive careful or negligent treatment. A duty arose at this point to treat her with the same care, skill, diligence, and ability, that would be owing by a private person or corporation under the same or similar circumstances."

In accord are Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631, and United States v. Gray, 10 Cir., 1952, 199 F.2d 239. Judge Dobie's Somerset opinion sufficiently distinguishes Feres v. United States, 1950, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, by saying, 193 F.2d at page 634:

> "* * * All that case really decided was 'the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries (arose) out of or are in the course of activity incident to service.'"

The holding of the Costley, Somerset and Gray cases was neither overruled nor impaired by the later decision of the

Supreme Court in Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427.[14] That was a test case representing some 300 separate personal and property claims aggregating $200,000,000 which were based on explosions of fertilizer with an ammonium nitrate base, at Texas City, Texas, in 1947. Suing under the Tort Claims Act, the plaintiffs claimed negligence substantially on the part of the entire body of federal officials and employees involved in a program of production of the material —Fertilizer Grade Ammonium Nitrate (FGAN)—in which the original fire occurred and which exploded. This fertilizer had been produced and distributed at the instance, according to the specifications, and under the control of the United States.

The question before the Court was whether the acts and omissions alleged as negligence were done or omitted in the performance of or failure to perform a discretionary function or duty within the meaning of § 2680(a). The Court said, 346 U.S. at page 34, 73 S.Ct. at page 697:

"* * * The 'discretion' protected by the section * * * is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law."[15]

The statement just quoted was supported in 73 S.Ct. at page 967, by footnote 30, which is as follows:

"It seems sufficient to cite Marbury v. Madison, 1 Cranch 137, 170, 2 L.Ed. 60; Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780; Alzua v. Johnson, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142; State of Louisiana v. McAdoo, 234 U.S. 627, 663, 34 S.Ct. 938, 940, 58 L.Ed. 1506; Perkins v. Lukens Steel Co., 310 U.S. 113, 131, 60 S.Ct. 869, 878, 84 L.Ed. 1108."

The Court went on to say, 346 U.S. at pages 35 and 36, 73 S.Ct. at page 968:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. * * * *"

It was then pointed out that the Cabinet-level decision to institute the fertilizer export program was a discretionary act; that the basic "Plan" for the production of FGAN was drafted by the Office of the Field Director of Ammunition Plants in June, 1946, prior to beginning production. It was further stated that each of the specific acts of negligence charged in the manufacture of FGAN was in accordance with and done under specifications and directions set forth in the basic Plan for the production of fertilizer. Each of the acts looked upon as negligence was directed by this Plan. The Court concluded as follows, 346 U.S. at page 42, 73 S.Ct. at page 971:

"In short, the alleged 'negligence' does not subject the Government to liability. The decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program."

We may fairly infer from the statement just quoted that the United States is liable for the negligence of its employees at the operational level, where there is no "room for policy judgment

14. The Government says the Somerset Seafood Co. case was overruled by the Dalehite opinion. We think not; our analysis of that opinion convinces us to the contrary.

15. This is the "historic principle," referred to in the Government's brief, about which there can be no dispute. But, as we have said, the real question here is whether tower activities fall within the principle.

---

and decision." This leads us to the Government's argument that the negligence charged against the tower operators is the same as that charged against the Coast Guard in the Dalehite case, which the Supreme Court held was not actionable because of the discretionary exception. We quote in the margin the Supreme Court's disposition of the alleged negligence of the Coast Guard.[16]

The Court made it clear that, as far as the alleged official dereliction of duty in failing to police the shipboard loading was concerned, the decision not to do so had been made at a policy-forming level and was not the decision of the individual members of the Coast Guard whose duty it would have been to do the policing had they been instructed to do it. The Court said:

"* * * To impose liability for the alleged nonfeasance of the Coast Guard would be like holding the United States liable in tort for failure to impose a quarantine for, let us say, an outbreak of foot-and-mouth disease."

We may paraphrase the quoted sentence thus:

"To impose liability for the alleged nonfeasance of the Coast Guard would be like holding the United States liable in tort for the failure of the CAA to take over for maintenance and operation a certain air traffic control tower."

Had the Coast Guard authorities decided to supervise the storage, we have no doubt the United States would have been liable in tort for any causal negligence of its personnel acting at the operational level. So it is here: discretion was exercised when it was decided to operate the tower, but the tower personnel had no discretion to operate it negligently.

The distinction between non-actionable planning and actionable negligence in carrying out the plan, was clearly stated by the Supreme Court in Johnston v. District of Columbia, 1886, 118 U.S. 19, 6 S.Ct. 923, 30 L.Ed. 75. Johnston's property was damaged when a sewer overflowed. He sued the District of Columbia, alleging that it "knowingly

---

16. 346 U.S. at pages 42-43 and 44, 73 S.Ct. at pages 971-972:

"The findings of negligence on the part of the Coast Guard in failing to supervise the storage of the FGAN, and in fighting the fire after it started, were rejected by a majority of the Court of Appeals. [Dalehite v. United States, 5 Cir.] 197 F.2d at 777, 780, 781. We do not enter into an examination of these factual findings. We prefer, again, to rest our decision on the Act.

"The District Court's holding that the Coast Guard and other agencies were negligent in failing to prevent the fire by regulating storage or loading of the fertilizer in some different fashion is like his specific citations of negligence discussed above. They are classically within the exception. 'The power to adopt regulations or by-laws * * * for the preservation of the public health, or to pass ordinances prescribing and regulating the duties of policemen and firemen * * * are generally regarded as discretionary, because, in their nature, they are legislative.' Weightman v. Corporation of Washington, 1 Black 39, 49, 17 L.Ed. 52. The courts have traditionally refused to question the judgments on which they

are based. Zywicki v. Jos. R. Foard Co., D.C., 206 F. 975; Gutowski v. Mayor of Baltimore, 127 Md. 502, 96 A. 630; State of Maryland to use of Goralski v. General Stevedoring Co., D.C., 213 F. 51.

"As to the alleged failure in fighting the fire, we think this too without the Act. The Act did not create new causes of action where none existed before.

"'* * * the liability assumed by the Government here is that created by "all the circumstances," not that which a few of the circumstances might create. We find no parallel liability before, and we think no new one has been created by, this Act. Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.' Feres v. United States, 340 U.S. 135, 142, 71 S.Ct. 153, 157, 95 L.Ed. 152.

"It did not change the normal rule that an alleged failure or carelessness of public firemen does not create private actionable rights. * * * To impose liability for the alleged nonfeasance of the Coast Guard would be like holding the United States liable in tort for failure to impose a quarantine for, let us say, an outbreak of foot-and-mouth disease."

constructed and continued upon an unreasonable and defective plan, and of inadequate capacity for its purpose, and wrongfully permitted [it] to become clogged up." The Court said, 118 U.S. at pages 20–21, 6 S.Ct. at page 924:

"The duties of the municipal authorities, in adopting a general plan of drainage, and determining when and where sewers shall be built, of what size and at what level, are of a *quasi* judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health and general convenience throughout an extensive territory; and the exercise of such judgment and discretion, in the selection and adoption of the general plan or system of drainage, is not subject to revision by a court or jury in a private action for not sufficiently draining a particular lot of land. But the construction and repair of sewers, according to the general plan so adopted, are simply ministerial duties; and for any negligence in so constructing a sewer, or keeping it in repair, the municipality which has constructed and owns the sewer may be sued by a person whose property is thereby injured."

With this distinction in mind, we turn to the trial court's opinion and find the following statement as to the nature of the acts and omissions of the tower operators which were held to constitute negligence:

"* * * As to negligence, I find that there was failure of the control tower personnel to issue a timely warning to the Eastern plane as to the P–38 being on final approach; in the failure, also, to warn the P–38 that Eastern was on final approach; in clearing both planes for the same runway at approximately the same time, having in mind their respective positions in relation to each other and the speed of both their approach and descent; and the failure to keep both planes advised as to the activities of the other; I find this to be negligence and concurrent both in character and in relation to that found by the jury with respect to the defendant Eastern. I find, further, that such negligence contributed proximately to the injury complained of."

The three negligent omissions and the one affirmative negligent act found by the court were not "decisions responsibly made at a planning level" and did not involve any consideration important to the practicability of the Government's program of controlling air traffic at public airports. The tower operators acted, and failed to act, at an operational level. While they were in a sense exercising discretion as to what they should and should not do, they were not performing the sort of discretionary functions contemplated by § 2680(a) and clearly described in the Dalehite decision.

It is therefore our opinion that, if a Government towerman negligently clears two planes to land on the same runway at the same time, or is guilty of some other negligent act or omission in doing his work, the Government is liable for resulting injury in the same manner and for the same reason that it is liable for injury done by the driver of a mail truck who, in exercising discretion as to how to drive, negligently runs through a red traffic light.

The Government contends, however, that even though its theory of non-liability under § 2680(a) be rejected, the judgments against it should be reversed because the trial court's findings do not provide sufficient factual bases for its ultimate conclusion of negligence. We deem it unnecessary to do more than quote the pertinent findings of fact, which expanded the above quotation from the trial court's opinion:

"3. At all times in question, there was available in good operating condition in the control tower at said airport and in each plane voice radio equipment for two-way con-

tact between said tower and either plane or between the tower and both planes simultaneously.

"4. For an adequate period of time before the collision, both planes were visible to the control tower personnel who observed said planes and knew that said planes were on converging approaches for landing on runway 3, and said personnel had an adequate opportunity to give timely warnings and instructions to each plane.

"5. At all times in question, weather conditions at and near the airport were excellent and visibility unimpeded.

"6. At all times in question, the Washington National Airport and the control tower facilities thereat were owned by the defendant, United States of America, and were being operated by it through its agents and employees (the tower personnel) assigned thereto by the Civil Aeronautics Administration, an agency of the United States.

"7 The said agents and employees of the United States in their operation of the control tower at said airport failed to exercise reasonable care and were guilty of negligence in the circumstances in question in that, having in mind the respective positions of said planes in relation to each other and their speed of approach and descent:

"a) they failed to issue a timely warning to the Eastern plane concerning the P–38 on final approach;

"b) they failed to warn the P–38 that the Eastern plane was on final approach;

"c) they cleared both planes for the same runway at approximately the same time; and

"d) they failed to keep both planes advised of the activities of the other.

"8. The negligence of United States through its agents and employees, as set out in finding No. 7 above, was a proximate cause of the fatal collision resulting in the deaths of plaintiffs' decedents, and such negligence of the United States also concurred with the negligence of Eastern as the proximate cause of said collision.

"9. The collision occurred over the Potomac River within the boundary of the District of Columbia."

These findings seem to us to be sufficiently in detail to justify the conclusion of negligence.

■ It is observed that the Government does not directly charge that the evidence is insufficient to support the findings of fact which were made by the trial judge. We have considered the question, however, and have concluded there was proof adequate to support the findings, although it is meager with respect to the finding that the tower cleared both planes for the same runway at approximately the same time—which is probably the most important of the findings. For, although the trial court was amply justified in finding (contrary to the jury's apparent conclusion) that the Eastern plane was cleared to land— and indeed could hardly have found otherwise,—there is only slight·evidence tending to show the Bolivian·plane was ever cleared to land.

Bridoux himself practically conceded his own negligence (of which the jury rather unaccountably exonerated him) in mistaking the message "You are No. 2 to land" for actual and absolute landing clearance. But he did say: "I said 'Washington Tower, Bolivian P–38 on final approach.' They responded to me immediately. * * * 'Bolivian P–38, prepare to land on runway 3.'" Consequently, if the trial judge believed, as apparently he did, that Bridoux actually sent such a message and received such an answer from the tower, there was some evidence that the tower gave landing clearance to the Bolivian as well as to the DC–4. We cannot substitute our

judgment on a factual issue for that of the trial judge simply because we might have reached a different conclusion.

■ As to all the foregoing, the court is unanimous. We are divided, however, as to another contention of the United States which remains to be considered: that it was error to measure the Government's liability under the law of the District of Columbia,[17] which does not limit the amount of damages for wrongful death, instead of under the law of Virginia, which limits recovery to $15,000 for the death of one person. The contention is based on the fact that, although the planes collided in the District of Columbia, the negligent acts and omissions of the tower operators occurred in the tower, which is in Virginia.

The general conflicts rule disregards the law of the place of the negligent act or omission and, instead, uses the law of the place where the injury was sustained. My brothers Edgerton and Fahy are of the view that the trial court erred in applying the general rule here because the Tort Claims Act provides in § 1346(b) that

"* * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for * * * death caused by the negligent or wrongful act or omission of any employee of the government * * * under circumstances where the United States, if a private person, would be liable to the claimant in accordance with *the law of the place where the act or omission occurred.*" (Emphasis supplied.)

They hold that Congress thus provided in explicit terms for the Government's liability to be measured under the law of the place where its negligent employee's act or omission occurred, and that therefore the Act requires Virginia law to be applied in this case.

I do not agree that the language of § 1346(b) compels us to conclude that Congress had in mind the general conflicts rule to which reference has been made and intended to make it inapplicable in situations such as this. I think the legislative expression "in accordance with the law of the place where the act or omission occurred" was intended to mean, and therefore should be construed as meaning, "in accordance with the law of the place where the tort occurred." An act, in legal as well as in popular use, is not merely a voluntary muscular contraction, but something more. The word commonly includes the consequences of the muscular contraction. If the defendant pulls the trigger and the bullet kills a man, in legal as in popular usage the killing is said to be the defendant's act.

In accordance with this usage, I interpret the statutory words "act or omission" as including not only the messages negligently sent or omitted by the tower operators, but also their immediate consequences. This is consistent with § 377 of Restatement, Conflict of Laws (1934), which reads: "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."

My interpretation also accords with that indicated by Assistant Attorney General Shea in his testimony before the House Committee on the Judiciary concerning the Tort Claims bill,[18] as being the then interpretation of the Department of Justice. He said, when asked where a claimant brings suit, "Either where the claimant resides, or *in the locale of the injury or damage.*" (Italics supplied.) The witness was referring to the venue provision of the then pending legislation which is now 28 U.S.C. § 1402(b):

---

17. The trial judge found from conflicting evidence that the accident occurred over the Potomac River, which is in the District of Columbia.

18. Hearings before the House Committee on the Judiciary, 77th Cong., 2nd Sess., on H.R. 5373 and H.R. 6463 (Jan. 29, 1942), p. 9.

"(b) Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred. June 25, 1948, ch. 646, § 1, 62 Stat. 937."

The words of § 1402(b) which he was construing are not only the same words which occur in § 1346(b), with which we are concerned, but also were used with a direct reference to that section.

The judgments against the United States will be affirmed, except that the judgment for $150,000 in No. 12,017 will be reduced to $15,000 to meet the limitation imposed by the law of Virginia on the amount of recovery.

The judgments in Nos. 11,991 and 11,992 are reversed and the cases are remanded for a new trial restricted to the issue of liability. The judgment in No. 12,017 is affirmed as modified and the judgment in No. 12,018 is affirmed.